# United States Court of Appeals for the Federal Circuit

---

**AGILITY LOGISTICS SERVICES COMPANY KSC,**
*Appellant*

**v.**

**JAMES N. MATTIS, SECRETARY OF DEFENSE, RYAN D. MCCARTHY, ACTING SECRETARY OF THE ARMY,**
*Appellees*

---

2015-1555

---

Appeal from the Armed Services Board of Contract Appeals in Nos. 57415, 57416, 57417, 57418, 57419, 57420, 57421, 57422, 57423, 57424, 57425, 57426, 57895, 57896, 57897, 57898, 57899, 57900, 57901, 57902, 57903, 57904, 57905, 57906, 57907, Administrative Judge Jack Delman.

---

Decided: April 16, 2018

---

JOHN PATRICK ELWOOD, Vinson & Elkins LLP, Washington, DC, argued for appellant. Also represented by MICHAEL CHARNESS, JOSHUA STEPHEN JOHNSON.

WILLIAM JAMES GRIMALDI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellees. Also

represented by CHAD A. READLER, ROBERT E. KIRSCHMAN, JR., CLAUDIA BURKE.

———————————

Before PROST, *Chief Judge,* LOURIE and CHEN, *Circuit Judges.*

PROST, *Chief Judge.*

This is an appeal from a decision of the Armed Services Board of Contract Appeals ("Board") dismissing for lack of jurisdiction. The Board found that the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 7101–7109, does not provide it with jurisdiction in this case. We agree and affirm the Board's decision in that regard. The Board also found that it lacked jurisdiction under its charter. Because that decision was not made pursuant to the CDA, we lack jurisdiction to review it. We therefore affirm in part and dismiss in part.

BACKGROUND

I

In 2003, the United States and its coalition partners created the Coalition Provisional Authority ("CPA") to rule in Iraq pending transfer of that authority to a newly constituted Iraqi government. J.A. 1–2; *see id.* at 318–19.

On June 6, 2004, the CPA awarded appellant Agility Logistics Services Company KSC ("Agility") the contract at issue (the "Contract").[1] *See* J.A. 598–671. Agility's

———————————

[1] In its opening brief, Agility purported to be a company organized under Kuwaiti law, and it asserted that the Contract was awarded to Agility under its former name, Public Warehousing Company KSC ("PWC"). Appellant's Br. 3 & n.1. After filing the opening brief, however, Agility's counsel notified this court that he had since learned that the current name of the entity formerly

scope of work under the Contract was to "establish and operate two distribution center warehouses and staging areas as part of a supply chain management system supporting the reconstitution of Iraqi security forces, and for the reconstruction support of Iraq civil infrastructure." J.A. 2 (citing J.A. 603). The Contract provided for the issuance of task orders setting forth specific work required. J.A. 604.

The Contract also specified that "[t]he obligation under this contract is made with Iraqi funds, as defined in CPA Memorandum [No.] 4 . . . . No funds, appropriated or other, of any Coalition country are or will be obligated under this contract." J.A. 3–4 (quoting J.A. 670). The CPA's Memorandum No. 4 defined "Iraqi funds" to include

---

known as PWC is actually Agility Public Warehousing Company KSCP. ECF No. 18 at 2. We remanded for the limited purpose of allowing the Board to determine the real party in interest and the impact of that determination on its decision. ECF No. 32 at 4.

On remand, the Board acknowledged the parties' agreement that "[Agility] has never existed" and clarified that "[Agility] is not the contractor." J.A. 2867. The Board also confirmed that the identity of the real party in interest did not impact its dismissal for lack of jurisdiction. J.A. 2869. But, citing concerns over the application of Iraqi law, the Board did not determine whether Agility Public Warehousing Company KSCP is the real party in interest here. J.A. 2868–69.

The government now argues that because the named appellant "never existed," Agility faces additional jurisdictional problems such as lack of standing. *See* Appellee's Br. 53–57. Because we affirm the Board's decision on other grounds, we do not reach these issues. We continue, however, to refer to appellant as Agility throughout this opinion.

funds from the Development Fund for Iraq ("DFI").[2] J.A. 340 ¶ 8.

The Contract further required Agility to acknowledge the impending transfer of authority and the CPA's scheduled dissolution:

> [Agility] hereby recognizes that a transfer of authority (TOA) from the [CPA] to the interim Iraqi Governing Council is scheduled to take place June 30, 2004. Furthermore, [Agility] recognizes that upon the TOA on June 30, 2004, or upon any later TOA date if delayed, the CPA is dissolved. The CPA, U.S. Government or Coalition Government will not be liable to the contractor for any performance undertaken after the TOA.

J.A. 671.

## II

In preparation for the transfer of authority to the Iraqi Interim Government ("IIG"), the CPA issued Memorandum No. 15 in mid-June 2004. J.A. 370–71. Memorandum No. 15 allowed the IIG Minister of Finance to delegate "responsibility to monitor and confirm performance, certify and/or make payments, and otherwise administer contracts or grants funded with monies from the [DFI]." J.A. 370. The memorandum allowed the IIG to delegate these responsibilities to the CPA's Program Management Office ("PMO") or, "following the transfer of full governance authority to the [IIG], the Chief of Mission of the United States Embassy, Baghdad and/or the Commander of the Multi-National Force-I." *Id.*

---

[2] The DFI was a fund administered by the CPA and composed of various sources, including revenue from sales of Iraqi petroleum and natural gas.

On June 15, 2004, the IIG Minister of Finance delegated contract-administration responsibility concerning DFI-funded contracts to the PMO. J.A. 373a–75a; *see id.* at 5–6. The delegation did "not authorize [the PMO] to terminate, amend, or novate any contracts or grants" covered by the delegation. J.A. 374a. It further stated:

> The powers, privileges, rights and authorities granted to [the PMO] under this designation may be further delegated. They shall transfer to the Chief of Mission of the United States Embassy Baghdad and the Commander of the Multi-National Force-I on June 30, 2004, both of whom shall also have the authority to delegate these powers, privileges, rights, and activities further.

*Id.*; *see id.* at 6.

Four days later, on June 19, 2004, Task Order No. 3 issued under the Contract. Unlike the first two task orders, Task Order No. 3 obligated U.S. funds. J.A. 803.

On or about June 28, 2004, the CPA dissolved and sovereignty transferred from the CPA to the IIG. J.A. 5. In accordance with the IIG Minister of Finance's June 15, 2004 memorandum, the PMO's contract-administration authority transferred to the Chief of Mission of the United States Embassy Baghdad and the Commander of the Multi-National Force-I effective June 30, 2004. J.A. 6–7.

Following the CPA's dissolution, contract-administration authority was further delegated to the Project and Contracting Office ("PCO"), a temporary organization within the Department of Defense that later became part of the Department of the Army. J.A. 7. On July 24, 2004, the PCO issued a memorandum providing its understanding of its authority under the IIG Minister of Finance's June 15, 2004 memorandum, stating:

> In accordance with the Ministry of Finance's letter[,] dated 15 June 2004, the [PCO] will continue

to monitor and confirm performance, certify and/or make payments, and otherwise administer contracts or grants financed by [the DFI] and awarded under the former [CPA]. The delegation letter does not grant us the authority to award, terminate, amend, or novate any contracts or grants under that delegation.

J.A. 7 (quoting J.A. 458).[3]

Several task orders issued under the Contract through December 2007. Of these, Task Order Nos. 3, 6, 9–12, and 14–20 (collectively, the "Task Orders") are at issue in this appeal. Each of the Task Orders obligated U.S. funds.

## III

In September 2010, after a period of negotiations between the parties, a U.S. contracting officer ("CO") issued final decisions regarding each of the Task Orders. The CO determined that Agility owed the government almost $81 million due to the government's overpayment. Agility appealed all but one of these decisions to the Board.

Separately, in April 2011, Agility submitted a certified claim to the CO seeking approximately $47 million for unpaid fees on the Task Orders. The CO denied the claim, and Agility appealed that decision to the Board as well.

The government moved to dismiss the appeals for lack of jurisdiction. Agility opposed the motion and argued that the Board had jurisdiction under the CDA, or alternatively under the Board's charter.

---

[3] The Joint Contracting Command-Iraq/Afghanistan ("JCC"), a U.S. Army component, later handled contract-administration responsibilities.

The Board rejected Agility's arguments and dismissed the appeals for lack of jurisdiction. J.A. 1–15. The Board first observed that its CDA jurisdiction was limited to contracts "made by an 'executive agency.'" J.A. 9 (citing 41 U.S.C. §§ 7101(8), 7102(a)). Board precedent held that the CPA was not an executive agency within the meaning of the CDA. Because the CPA undisputedly awarded the Contract, and because the Board found that the IIG assumed responsibility over the Contract as of the IIG's June 15, 2004 memorandum, the Board determined that it would lack CDA jurisdiction absent some showing that the Contract was novated or assigned to an executive agency. *Id.* The Board found no evidence of such a novation or assignment. Rather, it found that the government acted as a contract administrator, not as a contracting party. *Id.* at 9–10. Thus, the Board concluded that it lacked jurisdiction under the CDA. *Id.* at 11. In a separate discussion, the Board concluded that it lacked jurisdiction under its charter. *Id.* at 11–12.

Agility timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(10).

## DISCUSSION

Whether the Board has jurisdiction over Agility's claims is a question of law we review de novo. *E.g.*, *Arnold M. Diamond, Inc. v. Dalton*, 25 F.3d 1006, 1010 (Fed. Cir. 1994).

Contract interpretation is also a question of law we review de novo, though we give the Board's interpretation of government contracts careful consideration given its considerable experience and expertise. *Interstate Gen. Gov't Contractors, Inc. v. Stone*, 980 F.2d 1433, 1434 (Fed. Cir. 1992). Whether a contract existed between Agility and the government is a mixed question of law and fact. *Estes Express Lines v. United States*, 739 F.3d 689, 693 (Fed. Cir. 2014). And the Board's fact findings are final unless "fraudulent, arbitrary, or capricious," "so grossly

erroneous as to necessarily imply bad faith," or "not supported by substantial evidence." 41 U.S.C. § 7107(b).

As it did before the Board, Agility argues that the Board had jurisdiction under the CDA and the Board's charter. We address these arguments in turn.

I

The CDA applies to contracts "made by an executive agency," 41 U.S.C. § 7102(a), and gives the Board jurisdiction to decide appeals of contracting officer decisions relating to such contracts, *see id.* § 7105(e)(1)(A). Therefore, to determine whether the Board had jurisdiction under the CDA, we must decide whether the Contract was "made by" an executive agency. We conclude that it was not.

The Contract's plain language compels our conclusion. The Contract's first page confirms that the CPA awarded the Contract, J.A. 598, and Agility does not contend that the CPA is an "executive agency" within the meaning of the CDA.[4] Agility nevertheless presents several theories as to why the Contract—or, at least, each of the Task Orders—was made by an executive agency.

A

First, Agility contends that the IIG never assumed responsibility over the Contract. Though not entirely clear from its briefing, Agility's argument seems to be: given that the CPA dissolved, if the IIG never assumed responsibility over the Contract, the government must have emerged as the contracting party.

---

[4]    Although Agility suggests that the CPA issued Task Order No. 3 in its "capacity as an entity of the United States Government," Appellant's Br. 40, Agility does not contend that, when the CPA awarded the Contract, it did so as an "executive agency."

In support of its position, Agility argues that Task Order No. 3 "effectively amended" the Contract to permit obligation of U.S. funds. And, it contends, because the transfer-of-authority memoranda (i.e., the CPA's Memorandum No. 15 and the IIG's June 15, 2004 memorandum) both concerned only *DFI-funded* contracts, neither implicated the Contract. Agility thus concludes that the IIG never assumed authority over the Contract.

Agility's argument mistakes the order of events. The CPA awarded the Contract on June 6, 2004. At that time, the Contract was DFI-funded. On June 15, 2004, the IIG assumed responsibility over DFI-funded contracts and delegated contract-administration responsibility to the PMO, consistent with the authority granted by the CPA's Memorandum No. 15. Task Order No. 3 did not issue until June 19, 2004—four days *after* the IIG assumed responsibility over DFI-funded contracts. When responsibility over DFI-funded contracts transferred from the CPA to the IIG, the Contract was DFI-funded. The IIG therefore assumed responsibility over the Contract.

Agility next directs us to the parties' conduct. It argues that, "[e]ven if the [Contract] and the [Task Orders] were ambiguous regarding the [government's] contractual privity with Agility," the conduct of Agility, the IIG, and the government "definitively resolve[s]" any such ambiguity. Appellant's Br. 27. But we resort to extrinsic evidence to interpret a contractual provision only if that provision is ambiguous. *E.g.*, *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434–35 (Fed. Cir. 1996). Agility has not demonstrated that the Contract was ambiguous as to the identity of the contracting parties. The Contract clearly stated that the CPA awarded the Contract to Agility. J.A. 598. And, as described above, the IIG assumed responsibility over the Contract pursuant to memoranda issued as the CPA was preparing for dissolution.

Even if we were to consider the parties' conduct, it would not alter our conclusion. Agility argues that the government's actions such as issuing and amending task orders "cannot be squared with the notion that the [government] was acting as a mere 'agent' of the [IIG]." Appellant's Br. 29–30. We agree with the government and the Board, however, that the PCO acted as a contract administrator for the IIG—which is the role the PCO explicitly understood itself to be in. J.A. 7 (citing J.A. 458); *id.* at 9–10.

Agility's main contention concerning the parties' conduct is that the government exceeded the IIG's delegation of authority in several ways, such that it would be "implausible" to consider the government an agent of the IIG and not a party itself to the Contract or Task Orders. Appellant's Br. 32; *see id.* at 28, 30. Agility's argument seems to assume that if an agent acts outside the scope of its authority, the agent becomes (or is really) a contracting party. Agility supplies no legal authority for this proposition. In fact, although Agility cites the Restatement (Third) of Agency, Appellant's Br. 32, the Restatement acknowledges that "the fact that an agent acted without power to subject the principal to liability does not make the agent a party to the contract. This is because an agent who only purports to bind a disclosed principal to a contract does not promise to render any of the performance purportedly required from the principal." Restatement (Third) of Agency § 6.01 cmt. b (Am. Law Inst. 2006).[5] Therefore, even assuming for the sake of

---

[5]    *Id.* § 6.10 cmt. b ("[A]n agent does not become a party to a contract made on behalf of a disclosed principal unless the agent so agrees with the third party. Thus, if the principal on whose behalf the agent purports to act is not bound by a contract because the agent acted without actual or apparent authority, the third party may not

argument that the government exceeded its delegation of authority in certain respects, we see no reason to depart from our conclusion—compelled by the Contract's plain language—that the government was not a contracting party.

The issue before us is whether the Contract was "made by" an executive agency. For the foregoing reasons, we conclude that it was not.

### B

Agility next focuses on the Task Orders individually. It contends that each Task Order was a discrete contract made by an executive agency.

Agility relies on *Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969 (2016), for the proposition that each Task Order constituted a discrete contract. In *Kingdomware*, the Court considered whether the Department of Veterans Affairs ("DVA") must use the "Rule of Two" provision of 38 U.S.C. § 8127(d) every time it awards contracts. *Id.* at 1973. The DVA argued that § 8127(d) did not apply to "orders" issued under preexisting Federal Supply Schedule ("FSS") contracts.[6] The Court rejected that argument, finding that when the DVA places an FSS order, that order is a "'contract' within the ordinary meaning of that term." *Id.* at 1978.

---

subject the agent to liability on the contract unless the agent agreed to become a party." (citation omitted)).

[6] As the Court noted, the FSS "generally is a streamlined method for Government agencies to acquire certain supplies and services in bulk, such as office supplies or food equipment," and "FSS contracts are ordinarily pre-negotiated between outside vendors and the General Services Administration, which negotiates on behalf of various government agencies." *Id.* at 1974 (citations omitted).

Even assuming, however, that each Task Order under this Contract constituted a discrete contract, such contracts were not "made by" an executive agency.

Agility argues that the "Issued By" block on the Task Orders indicates they were made by an executive agency. Agility correctly notes that Task Order Nos. 6, 11–12, and 14–20 say they were issued by the PCO or the JCC. And although Task Order Nos. 9 and 10 say they were issued by the CPA, Agility observes that these Task Orders issued months after the CPA dissolved, suggesting that the PCO actually issued them. But Task Order No. 3 identifies the CPA as the issuer *and* issued before the CPA dissolved. Undiscouraged, Agility contends that the CPA was really acting as a U.S. executive agency when issuing this particular Task Order.

Initially, we note that neither party disputes the Board's finding that under these circumstances "the name appearing in [the 'Issued By' block] had little, real significance." J.A. 10. But even if we assume that an executive agency issued each of the Task Orders, that does not mean that an executive agency was a *party* to the Task Orders.

Agility again relies on *Kingdomware* in arguing that the Task Orders "created discrete contractual obligations for the government agency that issued them, not for the entity that made the umbrella contract against which the orders were made." Appellant's Reply Br. 15; *see Kingdomware*, 136 S. Ct. at 1978 ("When the [DVA] places an FSS order, that order creates contractual obligations for each party and is a 'contract' within the ordinary meaning of that term.").

We do not read *Kingdomware* to broadly hold that the issuer of any task order under any contract renders the issuer a party to the task-order-as-contract, regardless of the circumstances. Unlike here, for example, there was no indication in *Kingdomware* that the DVA's involve-

ment in the contracting was solely as a contract administrator for another party—much less for a foreign government.

Consistent with our earlier conclusion, we find that even if an executive agency issued the Task Orders, it did so as a contract administrator and not as a contracting party. Thus, the Task Orders were not "made by" an executive agency as required by the CDA.

C

Agility finally argues that the Contract was novated to make the government a party—if not to the Contract, then at least to the Task Orders. We reject this argument.

A novation is a "substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty." Restatement (Second) of Contracts § 280 (Am. Law Inst. 1981). "Assent of . . . the obligor of the new duty is always necessary." *Id.* § 280 cmt. c; *see* 30 Richard A. Lord, Williston on Contracts § 76:11 (4th ed. 2004) (observing "the agreement of all the parties to the new contract" or "consent of all the parties" as a required element of a novation); *accord Hicks v. United States*, 89 Fed. Cl. 243, 257 (2009).

Agility's novation theory is that it discharged the CPA's and IIG's obligation to pay in exchange for the government's promise to pay. But this theory is essentially just a reformulation of Agility's previous arguments. For example, Agility argues that the government demonstrated its intent to become a contracting party (in a novated contract) by allegedly exceeding its delegation of authority from the IIG and issuing the Task Orders. For reasons already discussed, we find that these acts do not show that the government was, or intended to be, a contracting party.

At bottom, Agility simply has difficulty pointing to a deal it had with the government as a *party*, and not as an agent. Agility's difficulty is especially hard to overlook in this case, where the Contract says:

> The . . . *U.S. Government . . . will not be liable* to [Agility] for any performance undertaken after the [transfer of authority].

J.A. 671 (emphasis added).

We conclude that no novation rendered the government a party to the Contract or the Task Orders. We further conclude, for the foregoing reasons, that the Board lacked jurisdiction under the CDA because neither the Contract nor the Task Orders were made by an executive agency. We therefore affirm the Board's dismissal for lack of CDA jurisdiction.

## II

Agility also argues that the Board had jurisdiction under its charter. 48 C.F.R. ch. 2, app. A, pt. 1. The Board decided it did not. And because that Board decision was not made pursuant to the CDA, we lack jurisdiction to review it.

Under 28 U.S.C. § 1295(a)(10), our jurisdiction over Board decisions extends only to decisions made pursuant to the CDA. *N. Am. Corp. v. United States*, 706 F.2d 1212, 1213 (Fed. Cir. 1983); *see also G.E. Boggs & Assocs. v. Roskens*, 969 F.2d 1023, 1026 (Fed. Cir. 1992); *Zinger Constr. Co. v. United States*, 753 F.2d 1053, 1054 (Fed. Cir. 1985). Agility acknowledges this precedent but argues that a 2011 amendment to § 1295(a)(10) changed our jurisdiction over Board decisions, superseding the precedent cited above. We disagree.

Before the referenced amendment, § 1295(a)(10) gave this court jurisdiction "of an appeal from a final decision of an agency board of contract appeals pursuant to section

8(g)(1) of the Contract Disputes Act of 1978 (41 U.S.C. 607(g)(1))." 28 U.S.C. § 1295(a)(10) (2006) (emphasis added) (version in effect from October 1982 to January 2011). In 2011, however, Congress removed the underlined language and replaced it with "section 7107(a)(1) of title 41." Public Contracts Act, Pub. L. No. 111-350, sec. 5(g)(5)(A), 124 Stat. 3677, 3848 (2011). The text of section 8(g)(1) of the CDA is substantively identical to that of 41 U.S.C. § 7107(a)(1).[7] This observation comports with the

---

[7]   Section 8(g)(1) of the CDA states:

The decision of an agency board of contract appeals shall be final, except that—(A) a contractor may appeal such a decision to the Court of Claims within one hundred twenty days after the date of receipt of a copy of such decision, or (B) the agency head, if he determines that an appeal should be taken, and with the prior approval of the Attorney General, transmits the decision of the board of contract appeals to the United States Court of Claims for judicial review, under section 2510 of title 28, United States Code, as amended herein, within one hundred and twenty days from the date of the agency's receipt of a copy of the board's decision.

Contract Disputes Act of 1978, Pub. L. No. 95-563, § 8(g)(1), 92 Stat. 2383, 2387 (1978). In 1982, Congress replaced references to the Court of Claims in the above-quoted text with references to this court. Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, sec. 156, 96 Stat. 25, 47 (1982).

Section 7107(a)(1) of title 41 states:

IN GENERAL.—The decision of an agency board is final, except that—(A) a contractor may appeal the decision to the United States Court of Appeals

2011 Act's schedule indicating that section 8(g)(1) of the CDA (previously codified at 41 U.S.C. § 607) would be recodified at 41 U.S.C. § 7107. Public Contracts Act sec. 7, 124 Stat. at 3860. And it is consistent with Congress's express intent to restate, not substantively change, existing law. *Id.* sec. 2(b), 124 Stat. at 3677 ("In the codification of laws by this Act, the intent is to conform to the understood policy, intent, and purpose of Congress in the original enactments, with such amendments and corrections as will remove ambiguities, contradictions, and other imperfections . . . ."); *see* H.R. Rep. No. 111-42, at 3 (2009) ("This bill is intended to restate existing law without substantive change.").

We conclude that the 2011 amendment to § 1295(a)(10) did not substantively change this court's jurisdiction over Board decisions, which remains limited to those decisions made pursuant to the CDA. Because the Board's decision concerning its charter jurisdiction was not made pursuant to the CDA, we have no jurisdiction to review it.

CONCLUSION

We have considered Agility's other arguments and find them unpersuasive. For the foregoing reasons, we

---

for the Federal Circuit within 120 days from the date the contractor receives a copy of the decision; or (B) if an agency head determines that an appeal should be taken, the agency head, with the prior approval of the Attorney General, may transmit the decision to the United States Court of Appeals for the Federal Circuit for judicial review under section 1295 of title 28, within 120 days from the date the agency receives a copy of the decision.

41 U.S.C. § 7107(a)(1).

affirm the Board's dismissal for lack of jurisdiction under the CDA.  Because our jurisdiction over Board decisions extends only to decisions made pursuant to the CDA, we dismiss the appeal insofar as it relates to the Board's decision concerning its charter jurisdiction.

## AFFIRMED-IN-PART AND DISMISSED-IN-PART

### COSTS

The parties shall bear their own costs.