# United States Court of Appeals for the Federal Circuit

———————————

**AGILITY PUBLIC WAREHOUSING COMPANY K.S.C.P.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————

2019-1886, 2019-1887

———————————

Appeals from the United States Court of Federal Claims in Nos. 1:15-cv-00351-TCW, 1:18-cv-01347-TCW, Judge Thomas C. Wheeler.

———————————

Decided: August 12, 2020

———————————

DEREK L. SHAFFER, Quinn Emanuel Urquhart & Sullivan, LLP, Washington, DC, argued for plaintiff-appellant. Also represented by JONATHAN GORDON COOPER; KRISTIN TAHLER, Los Angeles, CA.

WILLIAM JAMES GRIMALDI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by ETHAN P. DAVIS, CLAUDIA BURKE, ROBERT EDWARD KIRSCHMAN, JR.

———————————

Before REYNA, TARANTO, and STOLL, *Circuit Judges.*

REYNA, *Circuit Judge.*

In Appeal No. 19-1886, Appellant Agility Public Warehousing Company K.S.C.P. challenges a final decision from the United States Court of Federal Claims relating to the United States' offset of moneys due to Agility. The Court of Federal Claims determined that the United States' offset was valid and, thus, granted judgment in favor of the United States. Because the Court of Federal Claims did not evaluate the merits of the United States' offset determination nor the procedures required by law, we vacate the decision and remand for further proceedings. Consolidated with Appeal No. 19-1886 is Appeal No. 19-1887, in which we affirm the Court of Federal Claims' dismissal for lack of subject matter jurisdiction.

## BACKGROUND

Following the United States' invasion of Iraq, appellee United States and its coalition partners created the Coalition Provisional Authority ("CPA") to provide support for the reconstruction of Iraq. These appeals arise from the United States' offset of an overpayment it purportedly made to appellant Agility Public Warehousing Company K.S.C.P. ("Agility") during the reconstruction of Iraq.

I

On June 6, 2004, the CPA awarded a contract to Agility for the provision of logistics and management support for two separate staging area operations ("the PCO contract"). The PCO contract was a contract for indefinite delivery, indefinite quantity, under which the CPA could issue individual task orders to Agility.

The PCO contract noted that funds obligated under the contract were sourced from the Development Fund for Iraq ("DFI"). The CPA controlled the DFI, which was comprised

of Iraqi moneys, including revenue from sales of Iraqi petroleum and natural gas. The PCO contract provided that "*[n]o funds, appropriated or other, of any Coalition country are or will be obligated under this contract.*" J.A. 2025–26 (emphasis in original). The PCO contract also noted that Agility "recognize[d] that a transfer of authority . . . from the [CPA] to the interim Iraqi Governing Council [(the "IIG")]" would occur on June 30, 2004. J.A. 2026. The contracting parties to the PCO contract were the CPA and Agility. *Agility Logistics Servs. Co. KSC v. Mattis*, 887 F.3d 1143, 1149 (Fed. Cir. 2018) ("*Agility I*").

The PCO contract afforded the United States certain protections. First, the United States would not be liable to Agility under the PCO contract after the transfer of authority from the CPA to the IIG. *See* J.A. 2026 (providing that the "CPA, *U.S. Government* or Coalition Government will not be liable to the contractor for any performance undertaken after the [transfer of authority]" between the CPA and IIG (emphasis added)); *see also id.* (providing that "[t]he contractor hereby waives any claims and rights it now has or may have in the future against the CPA, U.S. Government or Coalition Governments in connection with the contract"). Second, the PCO contract expressly preserved the right of the United States to assert its own claims against Agility. *Id.* (providing that "[n]othing herein shall be construed as a waiver of any rights the CPA, U.S. Government or a Coalition Government may have against the contractor"). The PCO contract terminated on November 5, 2008.

II

In late June 2004, as planned, authority over the reconstruction of Iraq transferred from the CPA to the IIG, and the CPA dissolved. At this point, the IIG assumed the PCO contract from the CPA and, thus, became a party to the contract. Additionally, when authority was transferred from the CPA to the IIG, a June 2004 amendment to the

PCO contract provided that any claim Agility had under the contract could no longer be brought before the Armed Services Board of Contract Appeals but could now only be brought in an Iraqi court under the laws of Iraq.

Shortly before the transfer, the IIG issued a June 15, 2004 memorandum which designated the United States Army ("Army") as the contract administrator of all CPA contracts funded with moneys from the DFI entered on or before June 30, 2004, which included the PCO contract. As contract administrator, the Army had the authority to "enter into, administer, and/or terminate th[e] contract and make related determinations and findings." J.A. 1550. The Army was not a party to the PCO contract. *See Agility I*, 887 F.3d at 1151.

The June 15, 2004 IIG memorandum also made clear that the IIG controlled the funding for CPA-issued contracts, which included the PCO contract. The memorandum stated that the value of all CPA contracts could not exceed $800 million, provided that the IIG "may, at our discretion, increase this limit." J.A. 1657. The memorandum provided that "[a]ll disbursements made under the authority of this memorandum shall be accounted for on the books of the sub-account entitled 'Central Bank of Iraq/Development Fund for Iraq Transition.'" J.A. 1658. The memorandum also noted that:

> So long as [the Army] compl[ies] with all of the requirements set forth in this designation . . . [the IIG] will direct, as [the IIG] deem[s] appropriate, the Central Bank of Iraq to transfer (from time to time) funds from the Central Bank of Iraq/Development Fund for Iraq Transition account into an account in the Central Bank of Iraq . . . and [the Army] shall have the authority to make disbursements from that account in order to carry out your duties herein.

*Id.*

Throughout the lifecycle of the PCO contract, the Army issued a total of twenty task orders. Agility submitted invoices under each task order and the Army paid Agility. Notably, the Army paid Agility's invoices under task orders 1 and 2 with moneys from the DFI. In contrast, the Army paid Agility's invoices for task orders 3, 6, 9–12, and 14–20 with United States appropriated funds ("U.S. Funds"). The U.S. Funds were funds which Congress appropriated to the United States Army Corps of Engineers for the specific purpose of aiding in the "reconstruction of Iraq." Oral Arg. at 20:50–21:05,    *available*    *at*    http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2019-1886.mp3; *see also* Emergency Supplemental Appropriations Act for Defense and for the Reconstruction of Iraq and Afghanistan, 2004, Pub. L. No. 108-106, 117 Stat. 1209, 1225 (2003) ("Appropriations Act") (appropriating over $18.6 billion "for security, relief, rehabilitation and reconstruction in Iraq" to be "apportioned only to" various governmental entities, including the Department of Defense).[1]

### III

In September 2010, following the United States Defense Contract Audit Agency's (DCAA) audit of Agility's invoices under the PCO contract, the Army contracting officer issued final decisions regarding various task orders, under which the Army paid Agility with U.S. Funds. The Army contracting officer then sent demand letters for overpayments allegedly made under twelve task orders. Each demand letter explained that the overpayment "resulted from claimed subcontractor costs that were insufficiently supported by proffered information, expenses incurred beyond the obligation limit and authorized period of

---

[1]    In its briefing in *Agility I*, Agility recognized that the task orders at issue were paid with "U.S.-appropriated funds" and cited to this Appropriations Act. *See* Appellant's Br. at 39, *Agility I*, No. 15-1555, ECF No. 14.

performance and the associated indirect costs" that were previously paid. *See, e.g.*, J.A. 1663. Each letter noted that Agility was "indebted to the United States Government" for the overpayments. *See, e.g.*, *id.* Each letter provided that Agility should contact the Army contracting officer if Agility believed the debt to be incorrect. *Id.* Each letter also warned Agility that its alleged debt could be subject to "offset from Federal payments due." J.A. 1664. When combined, the demand letters identified a total of $80,830,305.62 of U.S. Funds allegedly overpaid to Agility.[2]

On July 8, 2011, the Army sent twelve letters, with attached bills, notifying Agility that it was going to initiate a collection action. The letters explained that payment was due under the "Debt Collection Act of 1982." *See, e.g.*, J.A. 2173.

In addition to its overpayment determination, the Army denied Agility's claim for $47 million under various task orders to the PCO contract. According to Agility, the

---

[2]    The record provides that in related litigation before the Armed Services Board of Contract Appeals and the United States District Court for the District of Columbia, actions discussed later in this opinion, Agility did not challenge the contracting officer's overpayment determination as to the alleged $81 million overpayment. Agility agreed that the United States overpaid it approximately $2 million. Thus, Agility only appealed approximately $79 million of the United States' $81 million overpayment claim. In its appeal before the Board, Agility separately explained that it recalculated its catering invoices using the preferred DCAA method and discovered that it had overbilled the United States approximately $38,000, which it excluded from that appeal.

Army had underpaid Agility $47 million rather than over-paying it $81 million.

By September 2012, the Army had not received pay-ment from Agility for the PCO contract overpayment claims.  Thus, around this time, the Army notified Agility that the Army was withholding payments in the amount of $17 million on a separate contract (the "DDKS contract") between Agility and the United States in order to offset a portion of its purported $81 million overpayment under the PCO contract.

IV

Agility sought review of the Army's overpayment deter-mination under the PCO contract in various forums.  First, Agility filed suit at the Armed Services Board of Contract Appeals (the "Board").  In that action, Agility sought review of the Army's determination that Agility had been overpaid and challenged the Army's denial of Agility's claim for $47 million.  The Board dismissed Agility's appeal for lack of jurisdiction under the Contracts Disputes Act ("CDA").  The Board determined that CDA jurisdiction was limited to contracts made "by an executive agency," pursuant to 41 U.S.C. §§ 7101(8), 7102(a).  The Board determined that the PCO contract was not made by an executive agency but by the CPA.  The Board also determined that the United States was not a contracting party but merely a contract administrator.  Agility appealed this decision to our court.

In *Agility I*, we affirmed the Board's dismissal.  887 F.3d at 1148.  We determined that the United States acted "as a contract administrator and not as a contracting party" to the PCO contract.  *Id.* at 1151.  Thus, we held that the Board lacked CDA jurisdiction to hear Agility's challenges related to the PCO contract, which was not "made by an

executive agency." *Id.* at 1148 (internal quotation marks omitted).

Having been shut out from the Board, Agility then sought recourse before the United States District Court for the District of Columbia ("District Court") and the United States Court of Federal Claims.

At the District Court, Agility challenged the validity of the Army's offset. *See generally Agility Public Warehousing Co. v. United States Dep't of Defense*, No. 16-cv-01837. Specifically, Agility alleged that:

> Defendants' actions in offsetting—or making available for offsetting—Agility's claimed debts against amounts owed to Agility under other Government contracts were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A), and were imposed without observance of procedure required by law, in violation of 5 U.S.C. § 706(2)(D).

J.A. 9; J.A. 2496. This District Court action is currently stayed pending this appeal. *See* Order, *Agility Public Warehousing Co. v. United States Dep't of Defense*, No. 16-cv-01837 (D.D.C. July 12, 2019).

At the Court of Federal Claims, Agility filed two separate cases, which were consolidated below. *See Agility Public Warehousing Co. v. United States*, Nos. 15-351C, 18-1347C. This appeal stems from these two actions. Before the Court of Federal Claims, Agility challenged the United States' offset. Specifically, Agility argued that our decision in *Agility I*, in which we determined that the Army was not a party to the PCO contract, "is conclusive and authoritative." J.A. 1418. According to Agility, because the Army was not a party to the PCO contract, any overpayment made under that contract was due to Iraq, and, thus, the Army had no right to seek this overpayment via an offset. Agility also argued that the Army's offset constituted a

breach of the DDKS contract, a breach of the Army's duty of good faith and fair dealing under the DDKS contract, and an illegal exaction.  Agility sought $17 million in monetary damages and a declaratory judgment that the United States may not, based on any alleged debt under the PCO contract, withhold funds the United States owes Agility.

The parties moved for judgment on the pleadings pursuant to Rule 12(c) of the Rules of the Court of Federal Claim ("RCFC") in Case Nos. 15-351 and 18-1347.  The government also separately moved to dismiss both cases for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1).

In addition to the arguments noted above, Agility argued in its RCFC 12(c) motion that the government should be judicially estopped from claiming entitlement to the alleged $81 million overpayment.  Agility relied on the government's briefing in *Agility I*, as well as the parties' oral argument in that appeal, to argue that the government has now taken an inconsistent position as to its liability under the PCO contract.

In its RCFC 12(c) motion, the government argued that while it was not a party to the PCO contract, the United States overpaid Agility under the PCO contract with U.S. Funds. Thus, the government argues, the overpayment was owed to the United States, not Iraq.  The government also argued that it was authorized, by the Debt Collection Act of 1982 ("DCA") and the common law, to offset the alleged $81 million overpayment with moneys it owed Agility under the DDKS contract.

The Court of Federal Claims granted the government's RCFC 12(c) motion in Case No. 15-351, determining that (1) the United States was owed the alleged overpayment and (2) the DCA authorized the United States to offset the alleged overpayment. *Agility Public Warehousing Co. v. United States*, 143 Fed. Cl. 157, 161, 172 (2019) ("*Decision*").   The Court of Federal Claims rejected Agility's

argument that the government should be judicially estopped from asserting entitlement to the alleged overpayment and that the government breached the covenant of good faith and fair dealing under the DDKS contract. *Id.* at 171–72. The Court of Federal Claims also rejected the government's alternative argument that it was authorized under the common law to offset the alleged overpayment. *Id.* at 169–70. This decision gives rise to Appeal No. 19-1886.

The Court of Federal Claims granted the government's RCFC 12(b)(1) motion in Case No. 18-1347 and dismissed that case for lack of subject matter jurisdiction. *Id.* at 172. This decision gives rise to Appeal No. 19-1887. We have jurisdiction over both appeals under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

As an initial matter, although Agility appealed the dismissal of Case No. 18-1347, giving rise to Appeal No. 19-1887, Agility did not challenge the dismissal in its briefing on appeal or at oral argument. We see no error in the Court of Federal Claims' dismissal and affirm the judgment in Appeal No. 19-1887.

Turning to Appeal No. 19-1886, Agility raises four challenges. First, Agility argues that the United States' offset was invalid under the DCA. Second, Agility argues that even if the United States' offset was valid under the DCA, the United States should be judicially estopped from claiming entitlement to the offset. Third, Agility argues that the United States' offset constitutes a breach of the covenant of good faith and fair dealing stemming from the DDKS contract. Lastly, Agility argues that at a minimum, this case should be remanded because material factual disputes precluded the Court of Federal Claims' grant of the government's RCFC 12(c) motion. We discuss each argument in turn.

We review the Court of Federal Claims' legal conclusions de novo and its factual findings for clear error. *SUFI Network Servs., Inc. v. United States*, 785 F.3d 585, 589–90 (Fed. Cir. 2015). We review de novo the Court of Federal Claims' grant of judgment on the pleadings under RCFC 12(c). *Sunoco, Inc. v. United States*, 908 F.3d 710, 715 (Fed. Cir. 2018). A "court should only grant a defendant's motion for judgment on the pleadings if the defendant is clearly entitled to judgment on the basis of the facts as the plaintiff has presented them." *Owen v. United States*, 851 F.2d 1404, 1407 (Fed. Cir. 1988). A court "must presume that the facts are as alleged in the complaint[] and make all reasonable inferences in favor of the plaintiff." *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009).

I

A

Before turning to the merits of Agility's challenge to the government's offset under the DCA, we believe it necessary to clarify two aspects of the DCA. First, the DCA does not give the United States a freestanding mechanism to create a debt but rather provides only a mechanism to offset a pre-existing, valid debt. Pursuant to the DCA, the United States government is authorized to "withhold[] funds payable by the United States . . . to satisfy a *claim*." 31 U.S.C. § 3701(a)(1) (emphasis added). Under the DCA, a "'claim' . . . means any amount of funds or property that has been determined by an appropriate official of the Federal Government to be *owed to the United States*[.]" *Id.* § 3701(b)(1) (emphasis added). "A claim includes, without limitation . . . over-payments[.]" *Id.* § 3701(b)(1)(C). Thus, under the DCA, a recoverable "claim" is one that must be first "owed to the United States." *Id.* § 3701(b)(1).

The context and history of the DCA enforces our interpretation that the DCA is a mechanism for collecting pre-existing, valid debts. Congress enacted the DCA to supplement the common law right of offset, which requires a pre-

existing debt owed to the offsetting party. *See McCall Stock Farms, Inc. v. United States*, 14 F.3d 1562, 1566 (Fed. Cir. 1993) ("[I]t must be emphasized that the Debt Collection Act was intended to supplement, and not displace, the government's pre-existing offset rights under the common law."). As provided in the enacting clause of the DCA, the Act's purpose is to "increase the efficiency of Government-wide efforts to collect *debts owed the United States* and to provide additional procedures for the collection of debts owed the United States." Pub. L. No. 97–365, 96 Stat. 1749, 1749 (1982) (emphasis added). This stated purpose "speaks of 'additional procedures' for debt collection, not replacement or revision of existing contract law doctrines." *Cecile Indus., Inc. v. Cheney*, 995 F.2d 1052, 1055 (Fed. Cir. 1993). Thus, Congress understood that to trigger the DCA offset provision, a pre-existing, valid debt must first be owed to the United States.

Second, the DCA cannot be reasonably interpreted as shielding from judicial review the United States' determination that a pre-exiting debt is owed. As the United States argued in this appeal, and Agility does not contest, "[c]ontractors may challenge offsets under their contracts, as Agility did below, or challenge the debt itself in district court, as Agility does in the D.C. District Court." Appellee's Br. at 34–35. Thus, when a court reviews a challenge to a DCA offset, it stands to reason that such review encompasses the underlying inquiry of whether the United States was even owed a pre-existing debt. This reading of the DCA parallels the case law on the common law of offsets, which calls for judicial review of the merits of the claim being invoked as an offset of a government debt. *See United States v. Munsey Trust Co. of Washington, D.C.*, 332 U.S. 234, 240 (1947) ("This power given to the Court of Claims to strike a balance between the debts and credits of the government, by logical implication gives power to the Comptroller General to do the same, *subject to review by that court*." (emphasis added)); *Wisconsin Cent. R.R. Co. v.*

*United States*, 164 U.S. 190, 211 (1896); *United States v. Bank of the Metropolis*, 40 U.S. 377, 401 (1841); *see also United States v. Mead*, 426 F.2d 118, 124–25 (9th Cir. 1970). With this backdrop in place, we now turn to Agility's challenge.

## B

Agility argues that any overpayment of U.S. Funds issued to Agility under the PCO contract cannot qualify as a pre-existing debt "owed to the United States" under the DCA. Specifically, Agility argues that any overpayment of U.S. Funds to Agility was never owed to the United States but rather to Iraq. Agility argues that "because the United States made the supposed 'overpayments' while acting as Iraq's agent" under the PCO contract, "any claim stemming from those overpayments would, if anything, attach solely to ***Iraq***." Appellant's Br. at 30 n.2 (emphasis in original). We disagree. To the extent the United States overpaid Agility with U.S. Funds, the United States is owed these funds, notwithstanding its role as contract administrator. This is because the United States has an independent and inherent right to recover erroneously expended congressionally appropriated funds.

The "[p]ower to release or otherwise dispose of the rights and property of the United States is lodged in the Congress by the Constitution." *Royal Indem. Co. v. United States*, 313 U.S. 289, 294–95 (1941); *see* U.S. Const. art. 4, § 3, cl. 2 ("The Congress shall have Power to dispose of . . . Property belonging to the United States."); *see also* U.S. Const. art. 1, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."). Thus, the executive branch must spend appropriated funds in accordance with the purpose for which Congress made the appropriations. *See* 31 U.S.C. § 1301 ("Appropriations shall be applied only to the objects for which the appropriations were made . . . .").

When a payment is erroneously or illegally made, as is alleged here, "it is in direct violation of . . . the Constitution." *Barrett Refining Corp. v. United States*, 242 F.3d 1055, 1063 (Fed. Cir. 2001) (quoting *Fansteel Metallurgical Corp. v. United States*, 172 F. Supp. 268, 270 (Ct. Cl. 1959)). To correct for this violation, the United States may exercise its "[well]-established right to sue for money wrongfully or erroneously paid from the public treasury," a right arising separate and apart from statute, regulation, or contract. *United States v. Wurts*, 303 U.S. 414, 416 (1938); *see also Bank of the Metropolis*, 40 U.S. at 401; *Barrett*, 242 F.3d at 1063; *Maryland Small Bus. Dev. Fin. Auth. v. United States*, 4 Cl. Ct. 76, 80 (1983); *Aetna Cas. & Sur. Co. v. United States*, 526 F.2d 1127, 1130 (Ct. Cl. 1975) ("It is a well-settled principle that the Government has *inherent authority* to recover sums illegally or erroneously paid . . . ." (emphasis added)); *Heidt v. United States*, 56 F.2d 559, 560 (5th Cir. 1932) (explaining that an individual who receives an overpayment from the government, regardless of whether the overpayment arose under a contract, is "liable to refund it" to the United States). The only time the United States is barred from exercising its inherent right to recover overpayments is when Congress has "clearly manifested its intention to raise a statutory barrier." *Wurts*, 303 U.S. at 416 (internal quotation marks omitted).

Here, no party disputes that the funds at issue under the PCO contract were congressionally appropriated U.S. Funds. Additionally, as the government explained at oral argument, Congress appropriated these funds to the United States Army Corps of Engineers for the narrow and explicit purpose of assisting the United States' efforts in the "reconstruction of Iraq." Oral Arg. at 20:50–21:05; *see also* J.A. 2638:22–2639:3; Appropriations Act, 117 Stat. at 1225. The government also noted, and Agility did not dispute, that to the extent the funds paid by the Army exceeded the cost for work actually performed for the

reconstruction of Iraq, such payments were not applied to the funds' congressionally authorized purpose. *See* Oral Arg. at 31:04–39. Thus, under these circumstances, the United States has an independent and inherent right to recover any overpayment of U.S. Funds. *See Wurts*, 303 U.S. at 416; *Barrett*, 242 F.3d at 1063; *Aetna*, 526 F.2d at 1130. On this basis, the United States is "owed" any overpayment of U.S. Funds issued under the PCO contract. The DCA is an appropriate vehicle for the United States to recover any such overpayment.

To be clear, Congress did not voluntarily gift these funds to Iraq to use at its discretion. *See* Oral Arg. at 22:40–48, 25:15–28. If this were the case, then potentially the United States could not recover these moneys:

> A voluntary payment made by an individual under no mistake of fact is ordinarily not recoverable, because he may do what he wills with his own money. But the rule is quite otherwise in payments of public money made by public officers. They have no right of disposal of the money, but must act according to law, the law operating as a limitation on their authority to pay.

*Heidt*, 56 F.2d at 560 (citation omitted). Here, Congress expressly provided that these funds would be apportioned to United States agencies assisting in the reconstruction of Iraq. *See* Oral Arg. at 20:50–21:05, 25:15–28; *see also* Appropriations Act, Pub. L. No. 108-106, 117 Stat. at 1225. Thus, stemming from this appropriations, the United States has an independent and inherent right to recover an overpayment of these funds.[3]

---

[3]    Agility argued for the first time in its rebuttal at oral argument that it could be subject to "double exposure" for the alleged $81 million overpayment if we decide that the United States has an independent right to the

Agility argues that the United States' recourse for recovering any overpayment "would be through its principal, the Iraqi Government." Appellant's Br. at 29. Agility argues that "[a]n agent does not itself assume rights or liabilities when dealing with a third party on behalf of its principal." *Id.* (citing Restatement (Third) of Agency § 6.01 cmt. b (Am. Law Inst. 2006)). Agility's argument, however, ignores the United States' independent and inherent right to recover misappropriated funds. *See Wurts*, 303 U.S. at 416; *Barrett*, 242 F.3d at 1063; *Aetna*, 526 F.2d at 1130.

In sum, we determine that the United States has a right to offset any overpayment of U.S. Funds under the PCO contract, notwithstanding its role as a contract administrator.

C

That the United States has a right to any overpayment, however, does not fully address whether the United States' offset under the DDKS contract was valid. For the United States' offset to be valid, either under the DCA or the common law, the United States must have actually overpaid Agility under the PCO contract. Here, Agility disputes the United States' overpayment determination. Specifically, according to Agility's complaint below, the United States "erroneously asserted that Agility had been overpaid"

---

overpayment. *See* Oral Arg. at 43:35–45. Whether Iraq could bring a claim against Agility for the overpayment is not at issue in this appeal. Additionally, our ruling as to the government's offset right is not dependent on whether Agility could potentially face double liability. However, to the extent that Agility could be doubly exposed, Agility could potentially avail itself of procedural avenues for addressing that possibility. *See* RCFC 14(b) (third-party practice); Fed. R. Civ. P. 20 (permissive joinder), 22 (interpleader).

$81 million under the PCO contract. J.A. 1427. Rather, Agility alleged below, the government still owed it approximately $47 million for work performed under the PCO contract. *Id.*

Notably, the Court of Federal Claims denied judicial review of the substantive validity of the United States' overpayment determination. *See Decision*, 143 Fed. Cl. at 171. The Court of Federal Claims reasoned that once the Army contracting officer made the overpayment determination, the determination itself was sufficient to establish a valid "claim" under the DCA and that it was "powerless" to determine otherwise. *Id.* This was legal error.

As noted earlier, a party's challenge to a government offset taken under the DCA is subject to judicial review. This review logically encompasses whether the government correctly assessed an overpayment. To illustrate, if Agility is correct that the government underpaid it rather than overpaid it under the PCO contract, then there would be no erroneous payment of U.S. Funds giving rise to the United States' "claim" under the DCA. In turn, the United States would have "no legal basis for withholding" the money owed to Agility under the DDKS contract based on a debt under the PCO contract, as Agility alleged in its complaint below. J.A. 1439; *see also* J.A. 1443.[4]

Thus, we vacate the decision of the Court of Federal Claims granting judgment in favor of the government. We remand for the Court of Federal Claims to review in the first instance the merits of the United States' overpayment determination under the PCO contract, which serves as the basis for the United States' offset under the DDKS contract.

---

[4] If the United States underpaid Agility under the PCO contract, Iraq, as the principal to the PCO contract, would be liable to Agility for these underpayments.

II

Agility argues that even assuming the United States' offset under the DCA was valid, the Court of Federal Claims abused its discretion in declining to judicially estop the United States from claiming entitlement to this over-payment.  We disagree.

"The decision whether to invoke judicial estoppel lies within the court's discretion, and a refusal to apply the doctrine is reviewed under the 'abuse of discretion' standard." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996).  "The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed." *Id.*  Courts will review the following three non-exclusive factors to determine whether judicial estoppel applies:

> (1) whether the party's later position [is] clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2010) (internal quotation marks omitted).

Agility first argues that the United States should be judicially estopped because it "previously maintained" in the *Agility I* litigation "that *all* payments on the PCO Contract were made by *Iraq, not* the United States."  Appellant's Br. at 47 (emphasis in original).  According to Agility,

"[t]hat prior, successful submission forecloses the notion that the U.S. Government paid anything to anyone other than Iraq under the PCO Contract." *Id.* at 47–48. We are not persuaded.

The United States did not assert in *Agility I* that it paid the task orders at issue with Iraqi funds. Rather, the United States maintained that the funds obligated under these task orders were U.S. Funds. Thus, as the Court of Federal Claims determined below, the United States has not advanced an inconsistent position in this appeal with its prior litigation position in *Agility I*. *See Decision*, 143 Fed. Cl. at 172. Regardless, the United States did not persuade the Board or this court in the *Agility I* litigation that it used Iraqi funds to pay the task orders at issue. *See Trustees*, 593 F.3d at 1354. In *Agility I*, the Board noted in its decision that the United States paid the task orders at issue with U.S. Funds. On appeal, we noted that the task orders at issue were paid with "U.S. funds." *Agility I*, 887 F.3d at 1147.

Agility also argues the United States should be judicially estopped because the United States previously contended that it made the offset as a contract administrator for the PCO contract but now maintains that it took the offset separate and apart from its role as a contract administrator. Agility, however, has not shown that the United States persuaded the Board or this court in the *Agility I* litigation to accept the United States' earlier asserted position. *See Trustees*, 593 F.3d at 1354. In *Agility I*, the Board did not substantively address the offset, noting that "there [were] no appeals before us with respect to" the offset. J.A. 2031. On appeal, we reviewed only one issue: whether the CPA was an "executive agency" for purposes of CDA jurisdiction. *See Agility I*, 887 F.3d at 1150. Whether the United States issued an offset to recover the $81 million overpayment as a contract administrator was irrelevant to this jurisdictional issue. Indeed, we made no mention of

the offset in our opinion.  Thus, we decline to judicially estop the United States on this ground.

Finally, Agility argues the United States should be judicially estopped because the United States would derive an unfair advantage and impose an unfair detriment on Agility.  Specifically, Agility argues the United States is "escap[ing] from liability on Agility's PCO Contract claims . . . while nonetheless collecting on its own behalf in disregard of the essential role of the Iraqi Government as the only party with any *bona fide* claim under the PCO Contract."  Appellant's Br. at 52.  We reject this argument.  First, the terms of the PCO contract gave the United States the unfair advantage of which Agility now complains.  Under the PCO contract, Agility waived any rights it could bring against the United States under the contract while the United States reserved the right to bring any claims it otherwise had against Agility.  *See* J.A. 2026.  Additionally, as noted earlier, the United States has an independent right to the overpayment of U.S. Funds separate and apart from the PCO contract.  *See Wurts*, 303 U.S. at 416; *Barrett*, 242 F.3d at 1063; *Aetna*, 526 F.2d at 1130.  Thus, the United States gains no unfair advantage by offsetting the overpayment but rather collects a portion of the debt that Agility allegedly owes the United States.

For the above reasons, we determine that the Court of Federal Claims did not abuse its discretion in declining to judicially estop the United States from claiming entitlement to the overpayment.

III

Agility argues that the United States violated the covenant of good faith and fair dealing stemming from the DDKS contract.  According to Agility, by taking the offset, the government has "effectively den[ied] Agility a forum for recovering payments" under the DDKS contract "that have been unilaterally withheld." Appellant's Br. at 41–42.  We are not persuaded.  As demonstrated in this case, both the

Court of Federal Claims and this court have reviewed Agility's argument that the United States is not authorized to take an offset under the DCA because the United States was a contract administrator under the PCO contract. Additionally, the Court of Federal Claims will review the merits of the government's overpayment determination in the first instance on remand. For these reasons, Agility's breach of the covenant of good faith and fair dealing argument fails.

IV

Lastly, Agility argues that the Court of Federal Claims "overlooked" "gaps concerning whether the U.S. Government procedurally complied with the DCA." Appellant's Br. at 53. We agree.

Congress afforded debtors procedural protections under the DCA. In particular, before taking an offset under the DCA, the government is required to provide the debtor with:

(1) written notice of the type and amount of the claim, the intention of the head of the agency to collect the claim by administrative offset, and an explanation of the rights of the debtor under this section;

(2) an opportunity to inspect and copy the records of the agency related to the claim;

(3) an opportunity for a review within the agency of the decision of the agency related to the claim; and

(4) an opportunity to make a written agreement with the head of the agency to repay the amount of the claim.

31 U.S.C. § 3716(a)(1)–(4).

Here, the Court of Federal Claims concluded in passing that the July 8, 2011, letters and attached bills sent to

Agility "indicate that the Government acted in accordance with the Debt Collection Act." *Decision*, 143 Fed. Cl. at 171. However, upon review, these letters and bills did not provide Agility with all of the required procedural safeguards due under the DCA. These bills arguably provided Agility with notice of the debt and an opportunity for agency review. They, however, do not offer Agility an opportunity to inspect and copy the records of the agency related to the claim or an opportunity to make a written agreement with the head of the agency to repay the amount of the claim. *See* 31 U.S.C. § 3716(a)(2), (4). Thus, the July 8, 2011, letters and bills do not, as a matter of law, establish that the government afforded Agility all of the required DCA procedures.[5] Whether Agility received the required DCA procedures is a material factual dispute which should have precluded judgment in favor of the United States. For this additional reason, we remand for further proceedings.

## CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. In Appeal No. 19-1886, we

---

[5]    Additionally, the September 2010 demand letters do not, as a matter of law, establish that the government afforded Agility all of the required DCA procedural protections. *See, e.g.*, J.A. 1663. For example, these letters do not mention Agility's right to inspect and copy records of the agency related to the overpayment claim as required under 31 U.S.C. § 3716(a)(2). The government noted in passing for the first time at oral argument, and without citing to any record evidence, that it provided Agility with the records related to the overpayment claim. *See* Oral Arg. at 37:25–37. We decline to consider this new argument, which comes too late. *See Henry v. Dep't of Justice*, 157 F.3d 863, 865 (Fed. Cir. 1998) (declining to consider the government's argument raised for the first time at oral argument).

vacate the judgment below and remand the case for further proceedings. In Appeal No. 19-1887, we affirm the judgment below.

## AFFIRMED IN PART, VACATED AND REMANDED IN PART

COSTS

No costs.