NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**OSC SOLUTIONS, INC.,**
*Appellant*

**v.**

**SECRETARY OF THE NAVY,**
*Appellee*

_____

2024-1195

_____

Appeal from the Armed Services Board of Contract Appeals in No. 63294, Administrative Judge Laura J. Arnett, Administrative Judge Owen C. Wilson, Administrative Judge Richard Shackleford.

_____

Decided: January 7, 2026

_____

FRANK V. REILLY, Micanopy, FL, for appellant.

STEVEN MICHAEL MAGER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for appellee. Also represented by PATRICIA M. MCCARTHY, CORINNE ANNE NIOSI, BRETT SHUMATE.

_____

Before DYK, TARANTO, and CUNNINGHAM, *Circuit Judges*.

TARANTO, *Circuit Judge*.

In 2022, pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101–7109, OSC Solutions, Inc. filed a certified claim seeking compensation from the United States Department of the Navy, Naval Supply Systems Command Fleet Logistics Center Norfolk (Navy) for an alleged breach of contract. The Navy's contracting officer denied OSC's claim, and OSC timely appealed to the Armed Services Board of Contract Appeals (Board). In 2023, the Board denied the appeal, concluding that OSC did not have the asserted contract right to the compensation it sought. *In re OSC Solutions, Inc.*, ASBCA No. 63294, 2023 WL 5199793 (July 20, 2023) (*Final Decision*). We affirm.

I

A

On May 2, 2019, the Navy issued a solicitation for a Blanket Purchase Agreement (No. 0018919R0041) (BPA), requesting proposals from private parties to perform, for the Naval Facilities Engineering Systems Command, Mid-Atlantic, Public Works Department, the function of accepting and filling orders placed by the Navy for parts and materials for maintenance, repair, and operations—a function that included operating, with the contractor's own labor, four "shop stores" for that purpose. Supplemental Appendix (S. Appx.) 1–59. The BPA included in the solicitation stated that "services/products *can* be ordered under this BPA." S. Appx. 3 (emphasis added). It also stated: "This BPA does not obligate any funds. Funds will be obligated by placement of calls under Federal Acquisition Regulation [(FAR)] Subpart 8.4 entitled 'Federal Supply Schedules', or the use of a Government wide purchase card issued under [FAR §] 13.303 entitled 'Blanket Purchase Agreements.'" *Id.* (cleaned up). Seemingly contemplating about a five-year duration for the arrangement, the BPA included in the solicitation also estimated but did not guarantee future

orders: "The [Navy] estimates, but does not *guarantee,* that the volume of purchases through this agreement will be $70,070,404.09." *Id.* (emphasis added).

The solicitation further provided instructions to offerors for their proposals, including the following instruction concerning prices for "services" separate from prices for the eventual purchase and sale of materials under the BPA:

> The offeror shall propose a fixed discount rate to be applied to the service and material requirements *which will be established as a term in the resulting BPA.* The offeror shall offer a fixed discount for . . . [s]ervices . . . .

> Note: All requirements to include services and materials must be on a [Federal Supply] Schedule; no "open market" materials are permitted. . . .

> Separate price information shall be submitted for . . . service support as required by the [BPA]. The price for the services . . . shall include all fully burdened labor required to provide services . . . .

S. Appx. 12 (emphasis added).[1]

OSC submitted a proposal to the Navy, *see* S. Appx. 67–69, and on August 2, 2019, the Navy notified OSC of deficiencies in its initial offer—stating, in relevant part, that "[t]he price proposal must contain separately priced services," S. Appx. 68. OSC responded the same day by confirming to the Navy that it was in fact "offering the required services to the Navy for no additional charge as they are incidental to the purchasing of the products from [its] [General Services Administration] schedule contract.

---

[1] The term "open market" used in the quoted passage refers to items not listed on the Federal Supply Schedule or General Services Administration schedules. FAR § 8.402(f).

There is therefore no additional charge for OSC to offer the Navy the required services under the contract." S. Appx. 71. On August 8, 2019, OSC again confirmed to the Navy that there would be "no additional charge for . . . the required services." S. Appx. 72–73. In its final offer, OSC included a chart stating that the "Total Service Price" was "0.00" and that there was no "Monthly Price" for servicing the four shop stores. S. Appx. 61. OSC explicitly memorialized that "[s]tore service is included within the price of the products." S. Appx. 61; *see also* S. Appx. 66.

On January 2, 2020, the Navy accepted OSC's offer and issued BPA No. N0018920A0002 to OSC. S. Appx. 75—121. The BPA provided for a base period of one year (to end January 1, 2021) and permitted the Navy to exercise up to four one-year option periods, with a further FAR-based period that made the contemplated contract term five and one-half years. S. Appx. 110. Like the BPA included in the solicitation, the January 2020 BPA provided that "service/products *can* be ordered under this BPA"; that the Navy "estimates, but does not guarantee, that the volume of purchases through this agreement will be $70,070,404.09"; and that the "BPA does not obligate any funds" because "[f]unds will be obligated by placement of calls under [FAR] Subpart 8.4 . . . or the use of a Government wide purchase card issued under [FAR §] 13.303[.]" S. Appx. 76 (emphasis added). The BPA also clarified what parts and materials may or may not be ordered under the agreement, specifying that "[o]pen market items may not be ordered[.]" S. Appx. 76.

On January 2, 2021, the Navy exercised its first option to extend the arrangement by a year. S. Appx. 122–23 (Modification No. P00003). The Navy ordered supplies under the BPA.

## B

In July 2021, OSC emailed the contracting officer an invoice for $1,013,729.28, seeking payment for

"unabsorbed store services direct costs," S. Appx. 124—*i.e.*, its store-staffing labor costs that, because of unexpectedly low Navy orders, had not been covered (indirectly) by Navy purchases. OSC stated that "[t]he staffing services discount" it had provided—referring to its decision not to charge separately for its labor services under the BPA— "does not apply" because "the [Navy] estimated, but did not guarantee, that the volume of purchases through this BPA would be approx[imately] $70M (approx[imately] $1M average per month)" but the "BPA has not reached the proposal's estimated level of $1M per month." *Id.* (cleaned up). In October 2021, OSC requested "resolution of the unpaid invoice[ ]" or, alternatively, that "OSC's obligation of further performance be cancelled on October 29, 2021." S. Appx. 131.

The Navy decided not to exercise the next option year, and it terminated OSC's performance obligations on January 1, 2022. S. Appx. 126–27; *see* S. Appx. 110. The Navy also informed OSC that "there is no mechanism for billing labor under this BPA" and declined to modify the BPA to permit OSC to bill labor services. S. Appx. 128; *see* S. Appx. 125.

On February 17, 2022, OSC submitted a certified claim to the contracting officer, requesting $1,152,858 for its labor services performed pursuant to the BPA. S. Appx. 132–36. OSC reasoned that it was owed payment because the Navy had "only ordered at 17% of the [Navy's] [ ] estimated volume" of products, S. Appx. 133, and "that the government ha[d] strayed very far from the original meeting of the minds regarding this procurement," S. Appx. 135. The contracting officer denied the claim on April 18, 2022 because the BPA explicitly did not guarantee a particular volume of sales, labor costs were intentionally not priced in the BPA, and the BPA was not a "contractual obligation of the [Navy]." S. Appx. 137–39.

## C

On June 2, 2022, OSC appealed to the Board, arguing that the Navy breached an implied-in-fact contract and that OSC was owed $1,152,858 from the Navy for its labor services performed under the BPA. *In re OSC Solutions, Inc.*, ASBCA No. 63294, 2023 WL 1778405 at 4 (Jan. 17, 2023) (*Initial Decision*); *see Final Decision*, at 7 n.7 (noting OSC's correction of its complaint's slight misstatement of the claim amount).[2]  The Navy moved to dismiss the appeal. *Initial Decision*, at 1, 4. In January 2023, the Board determined that it had jurisdiction to consider a claim arising from an alleged implied-in-fact contract and denied the motion to dismiss. *Id.* at 5. The parties then moved for a decision on the record under Board Rule 11. *Final Decision*, at 1.

On July 20, 2023, the Board denied OSC's appeal. *Id.* As relevant here, the Board first rejected OSC's argument that the BPA entitled it to payment for the service (labor) costs incurred but not covered by the (unexpectedly low volume of) orders by and sales to the Navy. OSC's argument was that the BPA was actually a "requirements contract" under FAR § 16.503, which would have conferred upon OSC the exclusive right "to fulfill all orders under the BPA with OSC's products," *id.* at 7 & n.9, and thereby recoup its service costs through sales receipts. The Board rejected that argument, explaining:

> [T]he BPA is not a contract because it lacks mutuality of consideration. The BPA expressly stated that it did not obligate any funds or guarantee a specific volume of purchases . . . . OSC consistently indicated that its service costs were incidental to the purchase of products . . . . Because the BPA is

---

[2]    For the *Initial Decision* and *Final Decision*, we use the native page numbers shown in the decisions in the Appendix at 1–6 (for the former) and 7–20 (for the latter).

not a contract, it does not serve as a basis for Board jurisdiction or afford OSC any remedy.

*Id.* at 10.

The Board also rejected OSC's arguments that "the Navy should be required to pay for OSC's services under an implied in fact or constructive change theory." *Id.* at 7. The Board reiterated that the "BPA did not obligate government funds," which "demonstrate[d] both a lack of government intent to contract as well as a lack of consideration." *Id.* at 11 (emphasis omitted). The Board examined OSC's proposal and OSC's "repeated and express . . . communications" regarding compensation for its services and determined that OSC intended to "be compensated for service costs through product orders, not through the BPA." *Id.* The Board also determined that "OSC made a deliberate business decision to not separately price service costs." *Id.* The Board further explained that there was "no apparent change or extra work required from OSC" pursuant to the BPA and, thus, "no basis for an implied-in-fact contract that would be contrary to the terms of both OSC's proposal and the BPA." *Id.* at 11–13.

OSC timely appealed on November 21, 2023, having received a copy of the Board's decision on August 1, 2023. ECF No. 1; 41 U.S.C. § 7107(a)(1)(A). We have jurisdiction under 28 U.S.C. § 1295(a)(10).

## II

We review the Board's decisions on questions of law without deference but accept the Board's factual findings unless such findings are "(A) fraudulent, arbitrary, or capricious; (B) so grossly erroneous as to necessarily imply bad faith; or (C) not supported by substantial evidence." 41 U.S.C. § 7107(b). We review the Board's interpretation of contracts de novo, but with "careful consideration given its considerable experience and expertise." *Agility Logistics Services Co. KSC v. Mattis*, 887 F.3d 1143, 1148 (Fed. Cir. 2018).

We will read OSC's appeal as contending that its money claim is for breach of an express contract that is not the BPA alone but instead consists of specific Navy orders of products under the BPA, orders that effectively incorporate the BPA. Even when we take that generous view of OSC's argument, OSC cannot succeed. It has identified nothing in the product-order-plus-BPA that gives it the right to recover labor costs (other than as incorporated in product prices) it claims. We need not and do not draw any broader conclusion.

OSC has identified nothing outside the BPA itself that supports its claim, not even including in the record before us any relevant product order, let alone pinpointing what terms could give it the claimed right. Accordingly, like the Board, we look to the BPA itself. But nothing in the BPA supports OSC's claim either.

To the extent OSC asserts that the Navy promised to seek to purchase through OSC all of its required products (of the sort specified in the BPA), *i.e.*, that the BPA was a requirements contract, the BPA has no such terms. OSC has shown no error in the Board's determination that the BPA was "not a requirements contract." *Final Decision*, at 9 (explaining, among other things, that the BPA does not contain the FAR provision needed for requirements contract). To the extent OSC asserts that the BPA obligated funds, the BPA makes clear that it was *not* obligating any funds, as the Board determined. *Id.* at 5; *see* S. Appx. 76 (so stating and referring to FAR § 13.303, which includes § 13.303-3 ("[T]he Government is obligated only to the extent of authorized purchases actually made under the BPA.")).

More specifically, OSC can point to nothing in the BPA (alone or as incorporated in product offers) that imposes an obligation on the Navy to make payments for OSC's labor costs separately from whatever may be included in OSC's price for purchased products—not even an obligation to do so if the amounts ordered or purchased by the Navy fall

below some threshold.  There is simply no such language in the BPA.  And the absence of such language is compellingly reinforced by the background to issuance of the BPA.  OSC's proposal to the Navy in response to the solicitation and its follow-up explanations before the proposal was accepted are express that the Navy was *not* to be obligated under the BPA to make separate payments for services.

OSC argues that, "for the same reasons that written orders are express contracts, they are also implied-in-fact contracts" and that the "government has [ ] not . . . demonstrated . . . [that] the orders are not contracts." Appellant's Opening Br. at 14–15.  That argument is right in suggesting that, in this case, the fate of the implied-in-fact contract claim is tied to that of the express-contract claim.  OSC bears the burden of demonstrating that an implied-in-fact contract existed, and "the requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs." *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003).  For the reasons already set out in rejecting the express-contract claim, including the clear evidence that OSC made a calculated business decision about how to cover its labor costs (only through product sales), the Board was correct in ruling that there was no implied-in-fact contract whereby the Navy promised the labor payments OSC seeks in this case. *Final Decision*, at 11; *see* S. Appx. 76, 79.

## III

We have considered OSC's remaining arguments and find them unpersuasive.  We therefore affirm the decision of the Board.

**AFFIRMED**